FRANK E. SMITH, Private First Class (SS #495–52–6168),
U. S. Army, Petitioner

v

M. B. COBURN, Major General, Commanding General, HQ 1st
Region (ARADCOM), Stewart Air Force Base, New York;

JOHN A. HERBERG, Colonel, Commander, 4531st Combat
Support Group, Homestead Air Force Base, Florida;

FREDERICK E. ROSEMAN, Colonel, Commander, 47th Artillery
Brigade, Homestead Air Force Base, Florida;

CHARLES HILL, Lieutenant, Commander, A. Battery, 2d Battalion,
52d Artillery (HERC), Homestead Air Force Base, Florida;
and

JAMES E. DUNCAN, Captain, Chief, Security Police,
Homestead Air Force Base, Florida, Respondents

19 USCMA 291, 41 CMR 291

Miscellaneous Docket

No. 70–18

March 11, 1970

## Memorandum Opinion of the Court

In his "Petition for Grant of Writ of Habeas Corpus," petitioner avers that his pretrial confinement is illegal for its sole basis, as set forth in a statement of his Battery Commander, was "for the purpose of protecting other troops at A Battery, 52d Artillery, Homestead Air Force Base, from the offenses for which Petitioner is charged."

The petition and attached exhibits filed by petitioner show:

On January 8, 1970, First Lieutenant Michael W. Lepore, the Battery Commander, ordered petitioner confined pending trial upon two specifications of wrongful transfer, two specifications of wrongful sale, four specifications of wrongful possession, and one specification of wrongful use of marihuana. In support of his allegation that pretrial confinement is premised solely on the advisability of insulating the Battery members from his influence, petitioner relies upon an affidavit of Lieutenant Lepore (Attachment 5) reflecting that officer's recollection of his testimony at the investigation of the charges conducted pursuant to Article 32, Uniform Code of Military Justice, 10 USC § 832. After reciting the particulars of an investigation conducted into activities of the petitioner and one Specialist Eason, the following appears:

"Q. Did Mr. Sinquefield say to confine them?

**291**

"A. No. I was inexperienced in these matters and didn't know what to do. He placed them in my custody and mentioned several possibilities. Confinement was my choice.

"Q. Did LTC King suggest confinement to you?

"A. No.

"Q. Did he indicate that he was happy with your decision?

"A. No.

"Q. *Why did you rule out transferring them to the base?*

"A. *I don't really know, it just seemed in light of the seriousness of the offense that it was the best thing that could be done. They had no place in the unit and couldn't be useful anywhere else.*

"Q. Didn't you send another person up to the base on a similar offense?

"A. Segalla, yes.

"Q. Did anyone ever tell you it was wrong to send Segalla up to the base?

"A. No.

"Q. Would you be adverse to releasing them?

"A. *I would be opposed to letting them out of confinement.*

"Q. *Why?*

"A. *Because of the seriousness of their offense. I don't want them to be exposed to the rest of the personnel.*

"Q. *Did you confine them originally to protect the rest of the troops?*

"A. *I suppose that had something to do with it.*

"Q. *Did you have any indication at all that Private Smith was preparing to go AWOL?*

"A. *No, you never do.*

"Q. Do you know whether Segalla is still here at Homestead?

"A. No.

"Q. I am not familiar with the man's case. Why was he transferred to Homestead?

"A. Possession of Marijuana.

"Q. Regards to Smith. You are

the officer who signed the confinement orders?

"A. Yes." [Page 3, Attachment 5.]

Under interrogation by counsel for Specialist Eason, the following appears:

"Q. You said that you were unexperienced in these matters and did not know what to do and Mr. Sinquefield said the general procedure was to confine these people.

"A. He did not tell me to confine them. I said, 'What do I do with them?' He said it was my responsibility. I could confine them, transfer them to headquarters, or keep them at the battery.

"Q. When was your decision made to confine them?

"A. Right away.

"Q. You decided to confine them because they might contaminate the troops, and you also said something about a freeze?

"A. I thought that if I left them at the battery they would just be in the way. I didn't know what they would do with them at headquarters, so I thought confinement would be best.

"Q. I am interested in your legal reasons now rather than your practical ones. Did you consult with anyone about what the UCMJ says about pre-trial confinement?

"A. I read the confinement section of the UCMJ and thought that it was warranted by the seriousness of the offense. There was no outside influence in my chain of command that I know of to have them confined. I was not aware that they were brought up here from Key West." [Page 4, Attachment 5.]

It is clear from his answers, recorded above and supplied by the petitioner himself, that Lieutenant Lepore ordered the accused confined because of the seriousness of the offense charged. The soundness of this conclusion is established by the Table of Maximum Punishments, paragraph 127c, Manual for Courts-Martial, United States, 1969

(Revised edition). Under the Table, the maximum penalty for the five specifications alleging wrongful transfer, sale, and use of marihuana is dishonorable discharge, total forfeitures, and confinement at hard labor for twenty-five years. If the four specifications alleging wrongful possession of marihuana are separate offenses, the maximum confinement is increased to forty-five years. In any event, the seriousness of the offenses is self-evident. No abuse of discretion appears. See United States v Bayhand, 6 USCMA 762, 21 CMR 84 (1956); Levy v Resor, 17 USCMA 135, 37 CMR 399 (1967); Horner v Resor, Miscellaneous Docket Number 70-11, 19 USCMA 285, 41 CMR 285, decided March 11, 1970.

Accordingly, the petition is denied.